UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1482

XIU RONG CHEN; GUO CAI YANG,

            Petitioners,

      v.

ERIC H. HOLDER, JR., United States Attorney General,

            Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued: December 3, 2008          Decided: February 26, 2009

Before WILLIAMS, Chief Judge, and TRAXLER and KING, Circuit
Judges.

Petition for review denied by unpublished per curiam opinion.

**ARGUED:** Yee Ling Poon, New York, New York, for Petitioners.
Kristin Kay Edison, UNITED STATES DEPARTMENT OF JUSTICE, Office
of Immigration Litigation, Washington, D.C., for Respondent. **ON
BRIEF:** Robert Duk-Hwan Kim, New York, New York, for Petitioners.
Peter D. Keisler, Assistant Attorney General, Civil Division, M.
Jocelyn Lopez Wright, Assistant Director, UNITED STATES
DEPARTMENT OF JUSTICE, Office of Immigration Litigation,
Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Xiu Rong Chen and her husband Guo Cai Yang, both natives and citizens of the People's Republic of China, petition for review of a final order of the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). Chen's and Yang's asylum and withholding of removal claims allege that Chen suffered past persecution when Chinese officials fitted her with an intrauterine contraceptive device ("IUD") against her will after the birth of her first child with her first husband and that Chen and Yang fear sterilization upon return to China because of a second child that they had after they were married in the United States. Chen's CAT claim alleges that she fears detention and torture as a result of her violation of China's one-child policy; Yang's CAT claim likewise alleges that he fears detention and torture, but as a result of his leaving China illegally with the assistance of a snakehead.[1]

The BIA denied their asylum and withholding of removal claims, affirming the conclusion of the Immigration Judge ("IJ") that the forced IUD insertion was not persecution under the

---

[1] A "snakehead" is a professional smuggler of Chinese migrants. Chen Lin-Jian v. Gonzales, 489 F.3d 182, 186 n.1 (4th Cir. 2007).

Immigration and Nationality Act ("INA"), 8 U.S.C.A. § 1101 et seq. (West 2005 & Supp. 2008), and that any fear that the couple had of forced sterilization in the future was unreasonable. The BIA also denied their CAT claims, affirming the IJ's conclusion that the evidence failed to show that Chen and Yang would likely be tortured upon their return to China. For the following reasons, we deny Chen's and Yang's petition for review on all claims.

I.

Ms. Chen entered the United States in September 2001 as a nonimmigrant visitor for business and was authorized to remain in the United States for a temporary period not to exceed October 8, 2001. On January 1, 1997, prior to arriving in the United States, Chen gave birth to a son in China with her first husband. Following the birth of her son, Chinese family planning officials required Chen to have an "IUD insert[ed]" and to "go for [an] IUD check-up every three months." (J.A. at 244-45.) Because Chen experienced "an irregular period and pain," she "had the IUD removed approximately 3 months after it was fitted." (J.A. at 974.) After removing the IUD, Chen was still required to attend examinations every three months or so to determine if she had become pregnant. Chen and her first

3

husband eventually divorced, and Chen was granted custody of her son, who remains in China.

Mr. Yang entered the United States in May 2001 without inspection by an immigration officer. Prior to entering the United States, Yang had another wife with whom he had a daughter in China. After the birth of his daughter on May 6, 1999, family planning officials fitted his wife with an IUD to prevent pregnancy. But the IUD either "malfunctioned or dislodged," and his wife learned that she was again pregnant in January 2001 and stopped appearing for her IUD check-ups. (J.A. at 1785.) Fearful that the family planning officials would force his wife to have an abortion if they learned of her unauthorized pregnancy, Yang, whose older sisters and sister-in-law had been forcibly sterilized, decided that he and his wife should leave China and hopefully give birth to the child in the United States. Yang and his wife both left China in March 2001, but his wife left a few days before Yang and, according to a snakehead with whom Yang's brother-in-law spoke, "was killed when the small boat [she was on] capsized in rough waters." (J.A. at 1785.) Yang's first daughter remains in China.

Chen and Yang met for the first time in December 2003, married on March 26, 2004, and gave birth to a daughter on October 9, 2004. That same month, Chen filed an application for asylum with the Department of Homeland Security ("DHS").

Because she gave birth to her daughter with Yang, Chen "feared that [she] would be forced to have either an abortion or sterilization if [she] were returned to China." (J.A. at 574.) In fact, she knew two family members who had already been sterilized. An asylum officer interviewed Chen in November 2004, and DHS initiated removal proceedings against her by filing a Notice to Appear in immigration court, charging her with removability under 8 U.S.C.A. § 1227(a)(1)(B) (West 2005), as an alien present in the United States beyond the time permitted by her visa.

Yang filed a separate asylum application in November 2004. Yang explained that once Chen became pregnant, he feared that either Chen would be forced to have an abortion or sterilization or that he would be forced to be sterilized if the couple was returned to China. In December 2004, DHS initiated removal proceedings against Yang by issuing a Notice to Appear, charging him with removability under 8 U.S.C.A. § 1182(a)(6)(A)(i) (West 2005), as an alien present in the United States without having been admitted or paroled.

Before the IJ, Chen admitted the charges against her and conceded removability, but sought asylum, withholding of removal, protection under the CAT, and voluntary departure in the alternative. After Chen's counsel informed the IJ that Yang was also in removal proceedings, the IJ consolidated their

5

cases.   The IJ held a hearing on February 23, 2006 and denied all forms of relief to Chen and Yang.   The BIA dismissed the subsequent appeal on May 15, 2007.   Chen and Yang timely petitioned for our review of the BIA's order.   We possess jurisdiction under 8 U.S.C.A. § 1252(a) (West 2005).

II.

A.

The BIA's decision that an alien is ineligible for admission to the United States is "conclusive unless manifestly contrary to law."   8 U.S.C.A. § 1252(b)(4)(C) (West 2005).   "We treat administrative findings of fact as conclusive 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'"   Lin v. Mukasey, 517 F.3d 685, 691 (4th Cir. 2008) (quoting 8 U.S.C.A. § 1252(b)(4)(B) (West 2005)).   "We review de novo legal questions determined by the BIA, . . . affording appropriate deference to the BIA's interpretation of the INA and any attendant regulations[.]"   Lin, 517 F.3d at 691-92 (internal citations omitted).   Where, as here, the BIA affirms the decision of the IJ in a separate written opinion, we review both the BIA's decision and the IJ's decision to the extent the BIA relied upon it.   See Niang v. Gonzales, 492 F.3d 505, 511 n.8 (4th Cir. 2007).

6

B.

1.

We now turn to each of Chen's and Yang's claims. The couple first contends that the BIA's denial of their asylum and withholding of removal claims was inappropriate because the BIA's conclusion that the couple did not establish either past persecution or a well-founded fear of future persecution was manifestly contrary to law.

To qualify for asylum, an alien must demonstrate that he or she is unable or unwilling to return to his or her country of origin because of persecution, or a well-founded fear of future persecution, on account of his or her race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C.A. § 1101(a)(42). If an alien proves past persecution, that alien is entitled to a presumption of a well-founded fear of future persecution, which the Government can overcome only by establishing by a preponderance of the evidence either that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality, or that the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality. Lin, 517 F.3d at 692-93; 8 C.F.R. § 1208.13(b)(1) (2008). Responding to China's "one child" policy,

7

Congress amended § 1101(a)(42) to provide as follows:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Id.

To qualify for withholding of removal, an alien "bears the higher burden of showing that it is 'more likely than not' that, if removed to a particular country, [his or] her life or freedom would be threatened on account of one of the enumerated grounds." Lin, 517 F.3d at 692 (quoting Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004)).

Chen and Yang first dispute the BIA's conclusion that Chen's forced IUD insertion and required checkups "did not rise to the level of past persecution." (J.A. at 2.)

In Lin, we declined to consider whether forced IUD insertion is persecution under § 1101(a)(42), instead remanding the case to the BIA so that it could provide us with meaningful guidance on that question. Lin, 517 F.3d at 693-94. We did so because the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling," 8 U.S.C.A. § 1103(a)(1) (West 2005), and the

8

Supreme Court has often stated that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) (internal quotation marks omitted).

In a recent decision, In re M— F— W—, 24 I. & N. Dec. 633 (BIA 2008), the BIA finally provided the much needed guidance on whether and under what circumstances forced IUD insertion constitutes persecution.

Specifically, the BIA explained:

1. "[S]imply requiring a woman to use an IUD, and other more routine methods of China's implementation of its family planning policy, do not generally rise to the level of harm required to establish persecution. . . . [E]xamples of routine acts . . . that are lacking in harm sufficient to constitute persecution include reinsertion of an IUD after the removal of an IUD, fines for having removed the IUD that are not excessive, regularly required gynecological exams, and other routine fines and threats for disobeying the policy." Id. at 640-41.

2. "[T]o rise to the level of harm necessary to constitute 'persecution,' the insertion of an IUD must involve aggravating circumstances," such as physical abuse. Id. at 642.

3. "[S]hould the harm associated with an IUD rise to the level of persecution, there must still be a link between the harm and the reasons for its infliction that establishes that it is the result of, or is on account of, other resistance or one of the protected grounds described in section 101(a)(42) of the Act." Id. at 642.

9

In this context, "the BIA should be accorded Chevron deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication."[2] Aguirre-Aguirre, 526 U.S. 415, 425 (1999) (internal quotation marks omitted)).  And, applying that deference, we must uphold the BIA's determination that an IUD insertion without any sign of physical abuse does not constitute persecution.

In support of its conclusion that the required usage of an IUD is not persecution, the BIA distinguished IUD insertion from forced abortion or sterilization, explaining:

> While having an IUD inserted involuntarily is certainly intrusive and hinders a person's ability to control procreation, the temporary nature of its effects persuades us that such a procedure does not constitute persecution per se.  Unlike forced abortion and sterilization, using an IUD does not generally have permanent effects, other than the loss of time during which to conceive.  Absent evidence to the contrary, we find that under normal circumstances, the IUD user does not lose a child or the permanent opportunity to have a child . . . .

In re M—F—W—, 24 I. &. N. Dec. at 640.

Recognizing that one could certainly argue that "the perpetual use of an IUD, or any other birth control method,

---

[2] Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984) mandates that the BIA's interpretations of ambiguous sections of the INA must control unless those interpretations are unreasonable.  Id. at 844 (concluding that agency's interpretation of a statutory scheme it is entrusted to administer is controlling unless the interpretation is "arbitrary, capricious, or manifestly contrary to the statute.")

throughout a woman's child bearing years until menopause effectively results in a form of sterilization," In re M—F—W—, 24 I. &. N. Dec. at 636, the BIA nevertheless rejected the argument, reading the verb "sterilize" to mean "'to make sterile,'" which means "'[i]ncapable of sexual reproduction'" and concluding that "[t]his definition makes clear the permanency of the sterilization procedure—i.e., that it leaves one incapable of having children—and leads us to [conclude] . . . that IUD use should [not] be treated as the equivalent of sterilization." In re M—F—W—, 24 I. &. N. Dec. at 636 (quoting Webster's II New Riverside University Dictionary 1137 (1994)); id. ("Unlike sterilization, [IUD insertion] is a temporary measure meant to provide for birth planning and not to remove all possibility of future birth opportunities.").

Even were we to conclude that the BIA's interpretation of § 1101(a)(42) was not the best available interpretation of the statutory language, we certainly cannot say that its interpretation is unreasonable, and we must therefore afford Chevron deference to the BIA's conclusion that an IUD insertion, unaccompanied by any aggravating circumstance, does not generally constitute "persecut[ion] . . . for other resistance to a coercive population control program" within the meaning of § 1101(a)(42). See Chevron, 467 U.S. at 844 ("[A] court may not substitute its own construction of a statutory provision for a

11

reasonable interpretation made by the administrator of an agency.").

Applying the BIA's holdings to this case, we easily conclude, as the BIA did, that Chen and Yang have failed to allege past persecution. There is no testimony that "[Chen's] procedure differed from a voluntary IUD insertion," Li v. Gonzales, 405 F.3d 171, 179 (4th Cir. 2005), or that it was accompanied by any physical abuse. Chen notes that she was forced to have required check-ups every three months, but the BIA has concluded that "regularly required gynecological exams" do not rise to the level of persecution and we owe that conclusion Chevron deference as well. Moreover, Chen has failed to offer any evidence whatsoever establishing a nexus between the IUD insertion and her own resistance to China's population control policies.

2.

To succeed on their asylum claims absent evidence of past persecution, Chen and Yang must establish a well-founded fear of future persecution, which involves subjective and objective components. Ngarurih v. Ashcroft, 371 F.3d 182, 187 (4th Cir. 2004). To satisfy the subjective element, Chen and Yang must present "candid, credible, and sincere testimony demonstrating a genuine fear of persecution." Id. at 187. The objective element is satisfied by a showing of "specific, concrete facts

12

that would lead a reasonable person in like circumstances to fear persecution." Id. at 187-88.

In holding that Chen and Yang failed to establish a well-founded fear of future persecution, the IJ relied on a State Department report which provided:

> Generally, unless one of the parents is an "overseas Chinese" (i.e. has residency rights in another country), a family with a U.S.-born child or children receives no special treatment under family planning laws. In Fujian Province, for example, a family in which both parents are Chinese citizens would be expected to pay social compensation fees, may be required to pay extra tuition for "unauthorized" children attending school, and would be expected to conform to the restrictions in Chinese law on future offspring. U.S. diplomats in China are not aware of any cases in which returnees from the United States were forced to undergo sterilization procedures on their return.

Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, China: Profile of Asylum Claims and Country Conditions 26 (June 2004) [hereinafter "2004 State Department Profile"]. The IJ also noted that the BIA—in an unpublished opinion which the IJ failed to cite—agreed with the State Department "that someone who had two children in the United States only had a speculative case in nature and, consequently, did not serve to present a viable asylum claim." (J.A. at 201.) The BIA adopted the IJ's findings. (J.A. at 3 ("[F]or the reasons discussed by the Immigration Judge, we agree that the respondents failed to demonstrate . . . a well-founded fear of persecution in

13

China.")); see also Jian Hui Shao v. Mukasey, 546 F.3d 138, 152 (2d Cir. 2008) (noting that the BIA had relied on State Department reports to conclude that the Chinese Government does not have a national policy of requiring forced sterilization of parents who return with a second child born outside of China).

Chen and Yang contend that the IJ, as affirmed by the BIA, abused its discretion in concluding that they failed to establish a well-founded fear of future persecution because: (1) the IJ relied on an unidentified, unpublished BIA decision; (2) the IJ relied on the 2004 State Department Profile, which was unreliable and not supported by substantial evidence; and (3) the IJ failed to consider evidence in the record.

These contentions are without merit. First, the IJ's failure to cite to the unpublished BIA decision is of no consequence; the IJ relied on the reasoning of the unpublished BIA opinion and the BIA expressly adopted the IJ's reasoning in its review of this case. Second, as to the reliance on the 2004 State Department Profile, we have previously noted that "[a] State Department report on country conditions is highly probative evidence in a well-founded fear case." Gonahasa v. United States I.N.S., 181 F.3d 538, 542 (4th Cir. 1999). Finally, having reviewed the record before us, we conclude that the IJ, as affirmed by the BIA, did in fact "consider[] the evidence of record" but chose to give weight to the 2004 State

14

Department Profile and the unpublished BIA opinion in finding that Chen and Yang had failed to establish a well-founded fear or persecution. (J.A. at 211.) In short, we simply cannot conclude that the BIA's denial of asylum is "manifestly contrary to law." See 8 U.S.C.A. § 1252(b)(4)(C). Thus, we deny the petition as to the BIA's denial of Chen's and Yang's asylum and withholding of removal claims. See Camara, 378 F.3d at 367 ("Because the burden of proof for withholding of removal is higher than for asylum - even though the facts that must be proved are the same - an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal . . . .").[3]

---

[3] Chen and Yang also challenge the BIA's denial of their motion to remand for consideration of additional evidence—a copy of a May 2003 Changle City Administration Opinion, a 2003 Fujian Province Administrative Decision, and a July 1999 Q&A Handbook— in light of Guo v. Gonzales, 463 F.3d 109 (2d Cir. 2006). The BIA concluded that the "the [additional] evidence which has been submitted . . . does not demonstrate that respondents' subjective fear of harm on account of their opposition to China's coercive population control policies is objectively reasonable." (J.A. at 3.) We have reviewed this claim and conclude that it is without merit. See In re S—Y—G—, 24 I. & N. Dec. 247, 256-57 (BIA 2007) (concluding that the 2003 Changle City Administration Opinion and the 2003 Fujian Province Administrative Decision "do not reflect any basis for fearing sanctions that would rise to the level of persecution" and that the 1999 Q&A Handbook "does not indicate that forcible sterilizations are mandated in Fujian Province after the birth of a second child"), petition for review denied, Jian Hui Shao v. Mukasey, 546 F.3d 138 (2d Cir. 2008); In re M—F—W—, 24 I. & N. Dec. 633, 644 (BIA 2008) (noting that the Guo documents "reflected general birth planning policies that did not specifically show any likelihood that the alien, or similarly situated Chinese nationals, would be persecuted as a result of (Continued)

C.

We now turn to Chen's and Yang's claim that the BIA improperly denied their applications for CAT relief. To receive protection under the CAT, the alien must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2) (2008)). Torture is "an extreme form of cruel and inhuman treatment," 8 C.F.R. § 1208.18(a)(2) (2008), that is "intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2008). In considering an application for CAT protection, we consider "all evidence relevant to the possibility of future torture" including, but not limited to: past torture inflicted upon the applicant; the applicant's ability to relocate to another area of the country where torture is unlikely; and gross, flagrant, or mass violations of human rights. 8 C.F.R. § 1208.16(c)(3) (2008). We review the BIA's denial of CAT protection under the highly deferential substantial evidence test, <u>Dankam v. Gonzales</u>, 495 F.3d 113, 124 (4th Cir. 2007), and must deny the petition for review if the BIA's order is "supported by reasonable, substantial, and

the birth of a second child in the United States").

16

probative evidence on the record considered as a whole." I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992).

Chen's CAT claim alleges that she fears detention and torture as a result of her violation of China's one-child policy, and Yang's CAT claim alleges that he fears detention and torture as a result of his leaving China illegally with the assistance of a snakehead. In rejecting these claims, the IJ concluded, "[i]n regards to the Torture Convention, the State Department's Report is given full weight, in that it shows that the respondents would not be subject to sterilization. Therefore, the Court cannot consider a claim of torture." (J.A. at 211.) The BIA adopted this reasoning, concluding that Chen and Yang "failed to demonstrate that it is more likely than not . . . that they would be tortured upon return to China." (J.A. at 3.)

Applying our deferential standard of review, we are constrained to deny Chen's and Yang's CAT claims. Here, the 2004 State Department Profile, to which the IJ gave "full weight," (J.A. at 211), noted that violations of family planning policy are "civil offenses and result in civil penalties" and are "not considered criminal offenses," 2004 State Department Profile 21. And, with respect to the return of illegal emigrants from the United States, the 2004 State Department Profile stated as follows:

17

> The Chinese Government accepts the repatriation of citizens who have entered other countries or territories illegally. In the past several years, hundreds of Chinese illegal immigrants have been returned from the United States, and U.S. Embassy officials have been in contact with scores of them. In most cases, returnees are detained long enough for relatives to arrange their travel home. Fines are rare. U.S. officials in China have not confirmed any cases of abuse of persons returned to China from the United States for illegal entry.

2004 State Department Profile 33. We note that State Department reports "are usually the result of estimable expertise and earnestness of purpose, and they often provide a useful and informative overview of conditions in the applicant's home country." Tian-Yong Chen v. United States I.N.S., 359 F.3d 121, 130 (2d Cir. 2004). Thus, as in the asylum context, we find that "[a] State Department report on country conditions is highly probative evidence" in a case involving a CAT claim. Gonahasa v. United States I.N.S., 181 F.3d 538, 542 (4th Cir. 1999); see also Tu Lin v. Gonzales, 446 F.3d 395, 400 (2d Cir. 2006) (noting that although "[t]he observations of State Department country profiles do not automatically discredit contrary evidence presented by the applicant, and . . . are not binding on the immigration court, they are probative nonetheless" (internal quotation marks and citation omitted)).

Chen and Yang contend that the IJ failed to consider a 2001 Amnesty International report stating that the use of torture is "widespread and systemic" in China, (J.A. at 477), and a 2001

18

news article about a Chinese woman who was allegedly beaten to death for refusing sterilization. Both the IJ and the BIA considered this evidence, however, but simply found the 2004 State Department Profile more persuasive. This case is not one in which either the IJ or the BIA "completely ignored" a "huge mass of evidence bearing on . . . whether he is more likely than not to be tortured if . . . forced to return to China" and "failed to give the issue a responsible analysis." Lian v. Ashcroft, 379 F.3d 457, 461-62 (7th Cir. 2004). On the record before us, substantial evidence supports the BIA's decision to deny CAT protection. Accordingly, we must deny the couple's petition for review of the BIA's denial of their CAT claim.

### III.

For the foregoing reasons, we deny Chen's and Yang's petition for review of the BIA's denial of their claims for asylum, withholding of removal, and protection under the CAT.

PETITION FOR REVIEW DENIED